31254. McDANIEL *et al. v.* THE STATE.

DECIDED JUNE 13, 1946.

*A. H. Gray,* for plaintiffs in error.

*R. A. Patterson, Solicitor-General, Miller & Head,* contra.

GARDNER, J. ■ Since the case is reversed on a special assignment of error on the ground of newly discovered evidence, we will not comment on the general grounds.

■ Special ground 1 of the motion is based on the affidavits of Tobe Adams and Fletcher Lawrence, the owner of the Morning Star which was the subject-matter of the arson. It will be noticed that Fletcher Lawrence testified at the trial of Ralph McDaniel and Doc Hammond. These affidavits are accompanied by the supporting affidavits required for the consideration of an assignment of

error based on newly discovered evidence. We will set forth the affidavits of Adams and Lawrence in full, omitting the formal parts. Tobe Adams' affidavit reads as follows: "Deponent is a resident of the County of Covington, State of Alabama, and the city of Opp, in said county, and has been all of his life. During the month of February, 1945, and some time previous thereto deponent was engaged in the taxi business, that transporting persons for hire by automobile. Deponent has known Fletcher Lawrence, who was reared at Opp, Alabama, all of his life. About February 14th, 1945, deponent had a trip to Eufaula, Alabama, to take a couple of passengers, and knowing that the said Fletcher Lawrence had a place of business at Georgetown, Georgia, across the river from Eufaula, Alabama, after he delivered his passengers at Eufaula he drove across the river to see his friend Lawrence. Deponent had on previous occasions, when on trips to Eufaula, gone over to the said Lawrence's place of business to see him; this place of business being known as the Morning Star, and wine and beer were sold there.

"On the occasion last referred to, to wit, Feb. 14th, 1945, when he arrived at the said Morning Star, which was about 10 o'clock in the evening, he asked for Fletcher Lawrence, and was told by the man in charge, whom deponent did not know, but whom he heard others on that occasion call by the name of Joe, that Lawrence was no longer there, and that he, Joe, had the place and was operating it. Deponent drank a bottle of beer or so, and stayed around the place for perhaps an hour talking to the man called Joe. The man Joe asked deponent if he would haul a load of stuff for him across the river to Eufaula; deponent asked him 'What sort of stuff?' and was told by Joe that it was beer, that he had more than he wanted to keep at the place, and wished to take some of it to his home in Eufaula. Joe offered deponent $10 to do the hauling, and deponent agreed to do so. Joe loaded the truck and the back of the deponent's car with beer, the amount of which deponent does not know, but would judge it was about thirty-five cases of beer, and got in the car with deponent and they drove to Eufaula, to a house pointed out by Joe, where Joe unloaded the beer. On the way to Eufaula, Joe talked to deponent about buying a shotgun which Joe had put in the automobile when they left the Morning Star, saying he was taking the gun home. Deponent likes to hunt, and needed

a gun, and asked Joe what he wanted for the gun. Joe told him he would give him the gun in paying for hauling the load of beer, and deponent accepted it, and took the gun home with him at Opp, Ala.

"Deponent read something in the newspapers about the trial of Hammond and McDaniel at Quitman, Georgia, charging them with burning the Morning Star, and a few weeks thereafter, he met Fletcher Lawrence at Opp, Alabama, and got to talking with him about the burning, and in the course of the conversation told Lawrence about his having visited the Morning Star, about Joe telling him that he then owned the place, about hauling the beer for Joe, and about Joe paying him with the shotgun. Lawrence asked to see the gun, deponent took Lawrence to his home, and showed the shotgun to him which Joe gave him, and Lawrence identified the gun as being his property, and being the gun which he had left in the Morning Star on the day before the burning of the Morning Star; whereupon deponent turned the gun over to the said Fletcher Lawrence.

"Deponent did not know, and still does not know, either of the defendants, Ralph McDaniel and Vernon Hammond. He had never seen the man named Joe, herein referred to, before the transaction herein related, and has not seen him since, but could identify him should he see him again. Deponent has no interest whatever in the case of the State of Georgia v. Ralph McDaniel and Vernon Hammond. Should the said defendants be granted a new trial deponent would and will attend their trial in the Superior Court of Quitman County, Georgia, and testify to what is herein related.

"Deponent had not told any person of the transaction herein related with the man called Joe at the place of business of Fletcher Lawrence, called the Morning Star, at Georgetown, Ga., until he told Fletcher Lawrence of it some several weeks after the trial of the said Ralph McDaniel and Vernon Hammond. Deponent makes this affidavit with the knowledge that it will be used in support of the motion for new trial of the said Ralph McDaniel and Vernon Hammond. [Signed] TOBE ADAMS."

Fletcher Lawrence's affidavit is as follows: "Deponent is a resident of Quitman County, Georgia. Prior to February 14th, 1945, deponent was operating at Georgetown, Georgia, a place of business known as the Morning Star, at which wine and beer was sold, and

which was burned on the night of Feb. 14, 1945. Deponent was born and reared at Opp, Ala., and his mother still lives at Opp. On the morning of Feb. 14th deponent left Georgetown to go to Opp to visit his mother, and left one Joe Pippin in charge of the place of business called the Morning Star. Deponent had another place near Eufaula, Alabama, and Pippin, who lived in Eufaula, just across the river from Georgetown, worked for deponent where he was needed. Deponent was notified that his business had burned the next morning after the fire, and returned to Georgetown that same day. He questioned Joe Pippin about the fire, and Joe told him that he did not know who burned it.

"Ralph McDaniel and Vernon Hammond were indicted and tried at the September term, 1945, of Quitman Superior Court for the offense of burning the said Morning Star. Deponent went to Opp, Alabama, a few weeks after this trial, and happened to see Tobe Williams, who said he read in the newspapers about the trial of McDaniel and Hammond for burning deponent's place of business, and told deponent that he had been in Eufaula in February, had gone to the Morning Star to see deponent, was told by the man in charge that deponent no longer owned that business, but that he, Joe, was in charge; that this man Joe asked him, Adams, to take some beer to Eufaula to Joe's home, which he did, and that Joe paid him for the hauling with a shotgun. Deponent asked to see the gun, Adams took deponent to his home and showed him the gun. The gun thus shown to deponent by Adams was the shotgun which deponent left at the Morning Star on Feb. 14th, when deponent had left Joe Pippin in charge of the place, and which Joe Pippin testified on the trial of McDaniel and Hammond was in the place when it burned. Upon identifying the gun as his property, Tobe Adams turned it over to deponent, and deponent now has it.

"Deponent did not know any of the facts herein related until after Ralph McDaniel and Vernon Hammond were tried and convicted. Upon learning the said facts herein related, deponent immediately communicated them to Ralph McDaniel and Vernon Hammond, and to their attorney, A. H. Gray, this occurring during the month of October, 1945, in the latter part of the month.

"Deponent makes this affidavit with knowledge that it will be used in connection with the motion of McDaniel and Hammond for a new trial. Should they be granted a new trial he will be

present in court and testify to the facts herein stated. [Signed] FLETCHER LAWRENCE."

The defendants stated, among other things, that they did not know and had never seen Tobe Adams.

(a) New trials may be granted on newly discovered evidence (Code, § 70-204), but they are not favored. *Jackson* v. *State,* 56 *Ga. App.* 250 (2) (192 S. E. 454); *Southern Grocery Stores* v. *Kelley,* 57 *Ga. App.* 37 (194 S. E. 234); *Brand* v. *Lawrenceville,* 64 *Ga. App.* 357 (13 S. E. 2d, 214); *Landers* v. *State,* 68 *Ga. App.* 804 (24 S. E. 2d, 139). This court is always reluctant to set aside a jury verdict which has the approval of the trial court. Nevertheless, it is our duty to grant a new trial if in our opinion the facts and law of the case demand it. There have been many decisions written pro and con regarding the question of newly discovered evidence. Generally, where a counter-showing is made, the trial judge becomes the trior of the issue thus joined. In this case there was no counter-showing. The testimony for conviction depends almost entirely on the evidence of Joe Pippin. According to his own admissions and the testimony of witnesses, he was not a citizen of ordinary admirable characteristics. We do not mention this to criticize in any wise the jury as to the verdict, because the credibility of witnesses is entirely for them, nor do we mean to criticize the trial judge for approving the verdict with the evidence adduced at the trial, but there are circumstances and instances connected with the case that are out of the ordinary. In view of such, the newly discovered evidence, which appears from the record to be clear and clean-cut, makes this ground more appealing. Some of the instances to which we refer are: the fact that even though Pippin claims to have told the owner of the business, Lawrence, that he saw the defendants set fire to the building, and Lawrence denied this, that he, Pippin, "sung it" all over the neighboring town of Eufaula, Alabama. Again, the grand jury of Quitman County convened in March after the fire in February, yet a serious crime of this nature was not presented to it for consideration. Then too, we have the evidence on the alibi which the defendants introduced. The defense of alibi, of course, was one for the jury. Yet in view of this and other circumstances in the case, viewed in the light of the newly discovered evidence, we are convinced that a new trial should be granted. In another trial it will go to the

credibility of the witness, Pippin, and it will not be merely cumulative or impeaching. We think in a crime of this seriousness, before the defendants should be convicted under all the circumstances concerning this appeal, a jury should have the benefit of the newly discovered evidence. The witnesses who furnished the main affidavits contained in this motion, though not living within the jurisdiction of the court, have pledged themselves to be present at another trial. If the jury should consider the newly discovered evidence creditable on another trial, they would be obliged to find that the chief witness, Joe Pippin, falsified when he stated that Fletcher Lawrence was not the owner of the business, but that Joe Pippin owned it; they would also find that Pippin committed a theft involving a shotgun and about 35 cases of beer. These would, of course, all be jury questions, but if they should find that the witnesses who made the main affidavits in the ground of newly discovered evidence were truthful, they might also consider whether he, Pippin, had a motive for burning the building. We realize that these are all jury questions, but it seems to us that the newly discovered evidence presents circumstances and facts which the jury should have for consideration. We think that this court in *Todd* v. *Jackson,* 24 *Ga. App.* 519 (101 S. E. 192), very aptly expressed the true rule in this language: "The newly discovered evidence offered in support of the motion for a new trial being of such a character as probably would, if credited by the jury, produce a different result upon another investigation, the trial judge erred in overruling the motion. Although newly discovered evidence may be somewhat cumulative of testimony previously introduced, and impeaching in its character, the real ultimate criterion is the probability of a different result. *Mitchell* v. *State,* 6 *Ga. App.* 554 (65 S. E. 326); *Nolan* v. *State,* 14 *Ga. App.* 824 (82 S. E. 377), and cit.; *Paden* v. *State,* 17 *Ga. App.* 112 (86 S. E. 287)." We are convinced that with the newly discovered evidence before the jury there appears a probability that there will be a different result on another trial. This court also held in *Harper* v. *State,* 50 *Ga. App.* 298 (177 S. E. 886): "The real ultimate criterion by which the merit of such testimony should be measured is the probability of a different result; and when that probability appears, 'the ends of justice require that a new trial be granted.'" This ground of

16

the motion for a new trial is meritorious, and a new trial is granted thereon.

(b) The only other amended ground complains of the following charge of the court: "Should you find the defendants guilty, the form of your verdict would be, 'We, the jury, find the defendants guilty and fix their punishment at not less than blank years, naming the years, nor more than blank years, naming the years, in the penitentiary.'" The defendants were generally indicted and by agreement jointly tried. The gist of the assignment of error is that the court should have instructed the jury that they would be authorized, if they believed the State's evidence beyond a reasonable doubt, to find one of the defendants not guilty and the other guilty, and if they should find both guilty, they would be authorized and not bound to fix the punishment of each the same. Under the facts of this case, the court committed no error as contended in this ground. By consent of the parties, and approval of the court, they were both tried together. The evidence is identical as to each. So far as the State's evidence is concerned, both defendants were present, each of them engaged at the same time in setting fire to the building. There does not appear from the record any reason why the jury should have found one guilty and the other not guilty, or in finding both guilty, why one degree of punishment should be meted out to one and a different degree to another. See, in this connection, *Clackum* v. *Bagwell*, 40 *Ga. App.* 831 (151 S. E. 689). See also 23 C. J. S. 874, § 1294, and People v. Cleaver, 365 Ill. 93 (5 N. E. 2d, 463). This special ground is without merit.

The judgment is reversed solely on the ground of newly discovered evidence.

*Judgment reversed. Broyles, C. J., and MacIntyre, J., concur.*